ing to bind the town for work upon the ground that it was necessary, disregarding the plain statutory provisions which are prerequisite to the initiation of such work.

The order should be reversed, with $10 costs and disbursements. All concur.

---

PIER BROS. v. DOHENY et al.

(Supreme Court, Appellate Division, Fourth Department. March 8, 1904.)

1. SALES—FALSE REPRESENTATIONS TO COMMERCIAL AGENCY—FRAUD—INTENT.

Where the president of a corporation made false representations as to the corporation's solvency to a commercial agency, and plaintiff, relying on the agency's report, based on the false statements, sold personalty to the corporation on credit, the sale was induced by fraud, though the president did not intend to cheat or defraud plaintiff or others relying on the report, or to obtain plaintiff's property without paying for it.

2. SAME—KNOWLEDGE OF FALSITY—EVIDENCE.

In an action to recover property alleged to have been sold on credit in reliance on false representations to a commercial agency as to the solvency of the purchaser, evidence considered, and *held* to show that the agency had, at the time the false representations were made, no knowledge of certain unsatisfied judgments against the purchaser.

Appeal from Judgment on Report of Referee.

Action by Pier Bros. against George Doheny and another, as administrators of Lucius Gleason, deceased. From a judgment for defendants, plaintiff appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Charles H. Searle, for appellant.

Frank Hiscock and A. H. Cowie, for respondents.

WILLIAMS, J. The judgment should be reversed, and a new trial granted before another referee, with costs to appellant to abide event. The action was brought to recover damages for the conversion of 26 bales of hops, of the value of $1,121. The hops were originally the property of the plaintiff. About November 1, 1892, they were sold and delivered to the Greenway Brewing Company, and while in the possession of that company they were levied upon by the sheriff of Onondaga county by virtue of an execution issued upon a judgment against the company in favor of the estate of Lucius Gleason, and were sold February 9, 1893, and bid in for the said estate. After the levy, and before the sale, the plaintiff claimed the hops as its property, and demanded the same of the sheriff, who refused to surrender the same. The estate, with knowledge of the plaintiff's claim, received the hops under the purchase at the sheriff's sale, and appropriated the same to its own use. It paid no cash for the hops, but applied the amount of the purchase price upon its execution. The plaintiff sold the hops to the brewing company upon credit, never received any part of the purchase price thereof, and its claim of title thereto was based upon the allegation that the purchase was induced by fraud and deceit prac-

¶ 1. See Sales, vol. 43, Cent. Dig. § 96.

ticed upon it by the brewing company, and by reason thereof no title to the hops passed from it to the brewing company under the sale and delivery thereof. The question litigated in the case was the alleged fraud and deceit. The referee found that there was no fraud or deceit, and that the title did, therefore, pass to the brewing company. This finding was erroneous, and should not be sustained. Fraud and deceit were clearly established by the evidence, and the plaintiff was entitled to recover in the case. The facts with reference to this issue were not in dispute and, as found by the referee or proven in the case, were as follows: The hops in question were part of 70 bales sold and delivered at one time; the other 44 bales having been consumed before the seizure of the property by the sheriff upon the execution. The brewing company was a corporation with 2,000 shares of stock, of which 1,998 shares were held by John Greenway, the president and treasurer, 1 share by Lucius Gleason, vice president, and 1 share by Benjamin F. Hill, secretary, at the time of the sale of the hops. John Greenway was carrying on and managing the business. Plaintiff's New York manager, through an agent, made the sale of the hops, transacting the business with John Greenway. No representations were made by Greenway direct to the plaintiff or its manager or agent as to the condition or standing of the brewing company. The plaintiff, instead of requiring any statement from Greenway or the company itself, called upon Bradstreet's Commercial Agency for a report as to the brewing company, and received one, and relied thereon in making the sale and delivery of the hops upon credit, instead of requiring cash to be paid therefor. The report furnished plaintiff by the Bradstreet's Agency was compiled from information received from Greenway himself and from other sources, and it contained suggestions by the agency itself. Its representative visited the brewery in June, 1892, and had an extended interview with Greenway with reference to the standing and condition of the brewing company and its property, assets, and liabilities. Among other things, he received from Greenway some figures taken from a trial balance, purporting to show approximately the assets and liabilities of the company, as follows:

| | |
|---|---:|
| Estimated value of merchandise on hand | $100,000 00 |
| Packages | 64,661 56 |
| Bills receivable | 5,590 87 |
| Accounts receivable | 295,988 42 |
| Teams | 12,693 19 |
| **Total assets** | **$528,934 04** |

Liabilities.

| | |
|---|---:|
| Bills payable | $480,260 73 |
| Bond and mortgage | 6,950 59 |
| | $487,211 32 |
| Balance | $ 41,722 72 |

(These are the figures and footings as they appear in the record, but the footing of the assets is erroneous. It should be $478,934.04, and the liabilities would then exceed the assets by the sum of $8,277.28. I have endeavored to find out how this error occurred, whether in the printing or in the original statement, but I cannot do so.)

Greenway told the agency representative that the item of bills payable, $480,260.73, represented Gleason's claims, for which he held security in the form of title to the real estate, and had been reduced to about $380,000 from collecting their accounts receivable, and that he (Greenway) was then trying to negotiate a loan on the real estate to pay most, if not all, of Mr. Gleason's claim, and with this object in view had had an appraisal made of the value of all the buildings by two competent and conservative men, who were reliable, and their valuation of the buildings was $545,940, and that, in addition to the buildings, the ground they stood on, having a frontage on Water street of 500 feet, was worth at least $300 a foot, making the total value of the real estate about $700,000; and these statements of Greenway, with the figures, were put in the report made to plaintiff. The agency also put into their report the following facts, learned from other sources than Greenway or the brewing company:

"The business was established many years ago by John Greenway, father of the above-mentioned Greenway. The company has always done a large business, but, owing to losses by bad debts, etc., has not made any money of late years. At the time of senior Mr. Greenway's death the company was quite largely indebted for loans, the amount being about $490,000, and owing mainly to Mr. Gleason and one or two local banks; Mr. Gleason being secured by a mortgage on the company's property. About eighteen months ago the property was sold on mortgage foreclosure, and bid in by Mr. Gleason, who now holds title to the brewery and other real estate owned by the company."

The agency also put into its report the following facts, learned in part from Gleason and Greenway and in part from other sources:

"He [Gleason] executed a contract soon after the purchase, agreeing to reconvey the brewery property to Mr. Greenway upon his paying $12,500 on the 1st day of April, 1891, and $12,500 every three months thereafter until the whole of the debt was paid, with a proviso that whenever the indebtedness to Mr. Gleason and the Third National Bank was reduced to $250,000 Mr. Gleason was to execute a deed to him, and take back a mortgage as security for the balance."

The report also contained statements of its own, as follows:

"Of course, in the event of Mr. Gleason's debt being finally and fully paid, the property now owned by him becomes the property of Mr. Greenway, and would leave the company in very good condition, and its consummation would liquidate practically all the company's liabilities. Such an arrangement (raising of money on the real property to pay Gleason's debt) would place the company in a very good condition, as their assets would not be reduced by it, and be the means of funding substantially all their indebtedness, presumably at a moderate rate of interest, and on long time. They ask very little, if any, credit, except what they borrow, and there is apparently no doubt as to the company's property being sufficient to pay Mr. Gleason's claim without reference to the arrangement regarding the real estate. The plant is certainly valuable, and the business, with good management, should be successful."

The plaintiff received this report from the agency, relied upon it, believed it to be true, and was induced thereby to sell and deliver the hops on credit, and without receiving cash down therefor. The statements made by Greenway and embodied in the report were made for the purpose of being disclosed to the subscribers of the agency and of being relied upon in dealing with the brewing company. The statements were grossly false and untrue, and were known to be so by

Greenway when he made them. The item of "assets" was grossly exaggerated. The merchandise on hand put at $100,000 really amounted to only about $82,000, and some of that had been transferred, and was pledged for loans. The item "packages," put at $64,661.56, was really worth only about one-fifth that amount, or $15,000. The item of "accounts receivable," put at $295,988.42, contained one item of $143,815.52, account against the senior John Greenway, which was entirely worthless, and was put in judgment, and assigned to Gleason in 1890, so that the brewing company did not own it at all when this statement was made. The county and city accounts included in this item, amounting to about $73,000, were mostly old and stale. The bottling account included in this item, $72,512.57, was a nominal account, representing a branch of the business, and was of little or no value. The item "Greenway estate, $6,510.62," was of no value. The item "teams, $12,693.19," was exaggerated, and made up by charging to it all expenses incurred therefor. This is the uncontradicted condition of this statement as to the assets, largely founded upon the evidence of Greenway given on the trial. The liabilities are mostly made up of bills payable, $480,260.73. As a matter of fact this item could not be regarded as bills payable at all. It covered four judgments, amounting to $438,832.87, standing against the brewing company, but the original indebtedness for which the judgments had been recovered was still carried on the company's books, and it was therefore put into this item as bills payable. Nothing was said by Greenway to the agency's representative about any judgments against the company, and nothing was contained in the agency's report to the plaintiff. The statement made by Greenway and included in the report to plaintiff that this item of accounts payable had been reduced to about $380,000—that is, $100,000 had been paid upon it from collecting accounts receivable—was wholly false and untrue. In short, without going into further details, these statements by Greenway to the agent, which were communicated to the plaintiff, were grossly false and untrue, and were well known to Greenway to be so when he made the same; and yet in the face of these facts the referee found that in making the statements Greenway did not intend to deceive, cheat, or defraud the plaintiff or others, who, in reliance thereon, should deal with the company. The idea of the referee in making such a finding is apparent from the additional finding that Greenway believed the company could safely continue business, and pay for its purchases, and did not intend to obtain possession of the plaintiff's hops without paying for them; that is, there was no intent to deceive or defraud, because he believed the company could pay for the hops, and did not intend not to do so. There can be no doubt but that he made the statements for the purpose of establishing a credit with those who might deal with the company, and that the statements were communicated to the plaintiff, and it was thereby induced to give the 90-days credit, relying on the truth of the statements. It follows, therefore, as a matter of course, that Greenway intended to deceive the plaintiff, and thereby secure its property on credit, and such deceit resulted in damage to the plaintiff to the extent of the value of its hops sold and delivered.

That was a fraud upon the plaintiff whether Greenway believed the

property could be paid for or not; whether he intended it should be paid for or not. It was not necessary to find that the purchase was made with a design not to pay for the property, in order to render the company liable. While such a finding might be necessary where there were no representations, but merely a condition of insolvency, and of failure to disclose it, nothing of that kind is required when false representations are made and relied upon and damages result therefrom. Morris v. Talcott, 96 N. Y. 100; Phœnix Iron Co. v. Hopatcong, 127 N. Y. 206, 27 N. E. 841; Hotchkin v. Third National Bank, 127 N. Y. 329, 27 N. E. 1050; Harrisburgh P. B. Co. v. Welsh, 26 App. Div. 515, 50 N. Y. Supp. 299. It is well settled that fraud may be predicated upon false and fraudulent statements made by a person, firm, or corporation to a commercial agency for the purpose of obtaining a favorable standing with such agency, to be reported to its subscribers; and a subscriber to such agency, who relies upon such statements and standing reported to it by the agency, and sells goods on credit, which are not paid for, may maintain an action in fraud, though no fraudulent statements were made directly by the debtor to such subscriber. Tindle v. Birkett, 171 N. Y. 520, 64 N. E. 210, and the cases therein referred to.

Some question is raised as to whether upon the evidence here it could be said that the plaintiff relied upon the false statements of Greenway reported to it by the agency in making the sale, whether those statements were an inducing cause of giving the 90-days credit. Mr. Fingar, manager of plaintiff's New York office, who was its credit man, made the sale; that is, he received the offer, and on behalf of the plaintiff directed its acceptance, and the delivery of the hops. Before doing so he applied to the agency for a report upon the brewing company, and secured the report in question. The plaintiff never had any previous business transaction with the brewing company, and knew nothing about its condition or standing. Mr. Fingar testified before the referee that he relied absolutely upon that report; that there was a balance by the trial balance of assets over liabilities of $41,000, and there had been paid during the year $100,000 on the liabilities, and that the liabilities were secured by real estate outside the assets shown by the trial balance figures; and he stated further that, if he had known that there were judgments against the company for $30,000 and $96,000, he would not have given them any credit. It will be remembered that nothing whatever was contained in the report showing any judgments existed against the brewing company. The liabilities were not stated to include judgments, but were stated to be bills payable and a small bond and mortgage. An effort was made on the trial to show that Greenway told the agency's representative about the judgments, but no such evidence was secured. Mr. Smith, the agency's representative, testified nothing was said about a deficiency judgment, but only a foreclosure judgment, upon which the real estate was sold. It does not appear that the agency, at the time the representations were made to it in 1892, had any knowledge of the judgments as then existing. Mr. Smith said he supposed his agency knew of the recovery of the judgments in 1890 from the clerk's office reports to them, but he was assured by Greenway in 1892 that the only liabilities then existing were bills payable and a small bond and mortgage, and that the bills

payable covered Mr. Gleason's claims, which were secured by the title to the real estate vested in him. He said he knew judgments had been obtained, but did not know they remained then unsatisfied, and he understood from the talk with Greenway that the new arrangement, when the real property was sold and title vested in Gleason in 1890, superseded the old arrangements, and the land was thereafter the security for Gleason and the bank's claims. It cannot be said, therefore, that the agency in 1892, when Greenway made the statement in question, knew of the existence of unsatisfied judgments against the brewing company, and it is not, therefore, necessary to consider what legal consequences would result if it had such knowledge—whether its knowledge would be imputable to the plaintiff, and whether upon the evidence of Mr. Fingar. In that event there would be a failure to show reliance upon the report from the agency sufficient to maintain the action.

We conclude that fraud was established in this case, and the finding of the referee that there was no such fraud was contrary to the evidence, and that plaintiff's right to recover was beyond question. Therefore the judgment appealed from should be reversed, and a new trial granted, as already stated.

Judgment reversed, and new trial ordered, with costs to the appellant to abide the event, upon questions of law and of fact. All concur; HISCOCK. J., in result only.

---

BABCOCK et al. v. CLARK.

(Supreme Court, Appellate Division, Fourth Department. March 8, 1904.)

1. EJECTMENT—DEFENDANT'S DEED FROM PLAINTIFF'S ANCESTOR—IMPEACHMENT—ADMISSIBILITY.

In ejectment plaintiffs alleged that their ancestor was the owner of certain premises; that she died intestate, leaving plaintiffs as her heirs; and the defendant unlawfully took possession of the premises, and refused to surrender the same, etc. Defendant's answer denied plaintiffs' right to possession, and set up a deed from the ancestor. Held that, as the answer was not a counterclaim under Code Civ. Proc. § 514, providing that where the answer contains a counterclaim the plaintiff, if he does not demur, may reply with a denial and new matter, etc., so as to require a reply, plaintiffs, without further pleading, could impeach the deed as obtained by fraud and undue influence, and because of the mental incapacity of their ancestor.

2. SAME—RIGHT TO ATTACK DEED.

Where an action of ejectment is defended by setting up a deed from plaintiff's ancestor, plaintiff may impeach the deed as obtained by fraud or undue influence, or because of the ancestor's mental incapacity, without resorting to equity.

Appeal from Trial Term, Jefferson County.

Ejectment by Lamont M. Babcock and others against Samuel J. Clark. From a judgment for defendant entered on dismissing the complaint, plaintiffs appealed. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.